UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LISA D.,[1] on behalf of CHAD D., deceased | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CASE NO. 1:19-CV-534-MGG ) ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) |
| Defendant. | ) ) ) |

**OPINION AND ORDER**

Plaintiff, Lisa D., seeks judicial review of the Social Security Commissioner's decision denying her late brother's ("Chad's") application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). This Court may enter a ruling in this matter based on parties' consent pursuant to 28 U.S.C. § 636(b)(1)(B) and 42 U.S.C. § 405(g). As discussed below, the Court **REMANDS** the decision of the Commissioner of the Social Security Administration ("SSA").

**I.   RELEVANT BACKGROUND**

  **A.   Procedural Posture**

Chad applied for DIB on October 28, 2014. In his application, he alleged a disability onset date of October 25, 2014. On March 14, 2017, an administrative law judge ("ALJ") held a hearing regarding Chad's application. After the hearing, the ALJ

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name, middle initial, and last initial only.

entered an unfavorable decision on April 3, 2017. Chad timely challenged the ALJ's decision to the Appeals Council, which vacated the ALJ's decision on December 4, 2017, and remanded the case back to the ALJ for further proceedings.

While the case was pending, Chad died on January 4, 2018, from massive bilateral pulmonary thromboemboli. Lisa then began pursuing Chad's application on behalf of his estate. Then on April 24, 2018, an ALJ held a hearing on Chad's application that led to a second unfavorable decision on August 1, 2018. Lisa timely requested review from the Appeals Council, which denied the request on October 18, 2019. As a result, the ALJ's August 2018 decision is the final decision of the Commissioner.

Lisa timely sought judicial review of the Commissioner's decision from this Court when she filed her complaint on December 16, 2019. Lisa then filed her brief in support of her appeal on April 14, 2020, to which the Commissioner responded on May 18, 2020. No reply brief was filed.

### B.     The ALJ's Decision

In her August 2018 decision, the ALJ found that Chad suffered from the following severe impairments: Klippel-Trenaunay-Weber Syndrome[2]; neuropathy and weakness in the left upper limb; deep vein thrombosis; glaucoma; migraines; degenerative disc disease of the cervical spine; and obesity. The ALJ also found that

---

[2] Klippel-Trenaunay-Weber Syndrome is a congenital and rare vascular condition that manifests as "port-wine" stain birthmarks and varicose veins on extremities and can result in blood clots, skin infections, anemia, cysts, and chronic limb pain. *Klippel-Trenaunay Syndrome*, UCHICAGO MEDICINE, https://www.uchicagomedicine.org/comer/conditions-services/vascular-anomalies/klippel-trenaunay-syndrome (last visited Aug. 23, 2021); *see also* Camila K. Janniger, MD, *Klippel-Trenaunay-Weber Syndrome*, MEDSCAPE (Apr. 6, 2021), https://reference.medscape.com/article/1084257-overview (last visited Aug. 23, 2021).

none of Chad's severe impairments, nor any combination of his impairments, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Further, the ALJ found that Chad had the residual functional capacity ("RFC") to perform less than the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a).

The ALJ then found that Chad was unable to perform any of his past relevant work as a production laborer and press operator. The ALJ then concluded, based on the testimony of the vocational expert, that Chad had the ability to meet the requirements for employment as a call out operator and surveillance systems monitor as those jobs are defined by the Dictionary of Occupational Titles. Based upon these findings, the ALJ denied Chad's claim for DIB.

## II. DISABILITY STANDARD

In order to qualify for DIB, a claimant must be "disabled" as defined under the Act. A person is disabled under the Act if he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The Commissioner's five-step inquiry in evaluating whether a claimant is disabled under the Act includes determinations as to: (1) whether the claimant is doing substantial gainful activity ("SGA"); (2) whether the claimant's impairments are severe; (3) whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404; (4) whether the

3

claimant can perform his past relevant work based upon his RFC; and (5) whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520. The claimant bears the burden of proof at every step except the fifth. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## III.     STANDARD OF REVIEW

This Court has authority to review a disability decision by the Commissioner pursuant to 42 U.S.C. § 405(g). However, this Court's role in reviewing Social Security cases is limited. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The Court must uphold the ALJ's decision so long as it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Similia v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). Substantial evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence has also been understood as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). The Court reviews the entire administrative record to determine whether substantial evidence exists, but it may not reconsider facts, reweigh the evidence, resolve conflicts of evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

An ALJ's decision cannot stand if it lacks evidentiary support or inadequately discusses the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). At a minimum, an ALJ must articulate his analysis of the record to allow the reviewing court to trace

4

the path of his reasoning and to be assured the ALJ has considered the important evidence in the record. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not permitted to "cherry-pick" facts from the record to support a finding of non-disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Further, an ALJ may not ignore an entire line of evidence contrary to his findings. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ is not required to address every piece of evidence in the record, but he must at least provide a glimpse into the reasoning behind his analysis to build the requisite "logical bridge" from the evidence to his conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

## IV.  ANALYSIS

In challenging the ALJ's decision, Plaintiff argues that the ALJ erred in not analyzing Listing 7.18 regarding repeated complications of hematological, or blood, disorders at Step 3 of the disability determination process. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). If a specific listing has not been identified by name, it may be inferred from the ALJ's written decision that the ALJ correctly recognized the applicability of the specific listing. *Barnett*, 381 F.3d at 668. However, when the ALJ fails to discuss evidence in light of the Listing's framework, the ALJ can leave the court with "grave reservations as to whether his factual assessment addressed adequately the criteria of the listing." *Scott*, 297 F.3d at 595. Furthermore, when the Commissioner submits evidence of record

5

showing that the listing would not be satisfied, the court can be "hard pressed to find this precise conclusion either implicitly or explicitly in the ALJ's opinion." *Id.* at 595–96.

Here, the Commissioner does not dispute that the ALJ did not expressly discuss Listing 7.18 in her Step 3 analysis. However, the Commissioner argues that the ALJ's omission was a harmless error. "The doctrine of harmless error indeed is applicable to judicial review of administrative decisions." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). A legal error by the ALJ is harmless "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record [such that] remanding is a waste of time." *Id.* Yet, "the harmless error standard is not . . . an exercise in rationalizing the ALJ's decision and substituting . . . hypothetical explanations for the ALJ's inadequate articulation." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

### A. Coagulation Problems

To meet Listing 7.18, a claimant must present evidence of repeated complications of hematological disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 7.18. Such complications include

> those complications listed in 7.05, 7.08, and 7.10 but without the requisite findings for those listings, or other complications (for example, anemia, osteonecrosis, retinopathy, skin ulcers, silent central nervous system infarction, cognitive or other mental limitation, or limitation of joint movement), resulting in significant, documented symptoms or signs (for example, pain, severe fatigue, malaise, fever, night sweats, headaches, joint or muscle swelling, or shortness of breath), and one of the following at the marked level (see 7.00G4):
>
> A. Limitation of activities of daily living (see 7.00G5).

      B.  Limitation in maintaining social functioning (see 7.00G6).

      C.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace (see 7.00G7).

*Id.* Here, the Commissioner contends that Chad's impairments do not meet the criteria specified in Listing 7.18. Furthermore, the Commissioner argues that even if the ALJ did err by failing to expressly discuss Listing 7.18 in her decision, the error would be harmless as the ALJ's decision includes sufficient discussion of evidence showing that Chad's hematological orders were not severe enough to meet or medically equal Listing 7.18. The Commissioner's conclusions are not clearly explicit or even implicit in the ALJ's opinion. *See Scott*, 297 F.3d at 595–96. Therefore, the Court will evaluate whether the ALJ's "factual assessment addressed adequately the criteria of the listing." *Id.* at 595.

As an initial matter, Lisa argues that Chad had a lengthy history of serious coagulation problems but does not specify which of his disorders she believes qualify as hematological disorders under Listing 7.18. In the response brief, the Commissioner assumes the coagulation disorders Lisa meant to specify include Chad's diagnosis of Klippel-Trenaunay-Weber Syndrome ("KTWS") and deep vein thrombosis ("DVT"). Lisa did not file a reply brief and therefore did not rebut this assumption. Accordingly, the Court can only assume that Chad's KTWS and DVT are the only impairments at issue on this appeal. And the ALJ's decision does include references to Chad's KTWS and DVT as follows.

    First, in the Step 3 Listing analysis in her decision, the ALJ concluded:

    Although there is no specific listing for Klippel-Trenaunay-Weber Syndrome, I have considered this impairment under the listing of impairments in Appendix

7

> 1. There is no evidence indicating that the claimant's Klippel-Trenaunay-Weber Syndrome, or any of its reverenced [sic] impairment, has given rise to a condition of listing-level severity, and no program doctor including Dr. Buckwalter, who appeared as a medical expert at the hearing-has so advised. Accordingly, I find that the claimant's Klippel-Trenaunay-Weber Syndrome did not meet or medically equal any listing.

[DE 7 at 23]. Second, in outlining Chad's medical history as part of the RFC analysis, the ALJ acknowledged Chad's history of KTWS, "a rare birth disorder that caused malformation of blood vessels in the limbs" and deep vein thrombosis ("DVT"). [DE 7 at 25]. And third, at Step 4, when determining whether Chad could perform his past relevant work based upon his RFC, the ALJ discussed Chad's history of KTWS and DVT. Specifically, the ALJ found that Chad's DVT in the lower limbs "generally remained stable, but did continue to require blood thinning therapy and compression treatment." [DE 7 at 29]. In addition, the ALJ stated that Chad showed a "history of Klippel-Trenaunay-Weber Syndrome with associated fatigue, more so with exertion." *Id.* Thus, the ALJ did not completely ignore Chad's KTWS and DVT despite omitting any mention of Listing 7.18 specifically.

### B. Complications

In arguing that Chad met or medically equalled Listing 7.18, Lisa suggests that Chad endured complications from his coagulation problems including a splenectomy, several hospitalizations, the installation of an internal venal cava filter, and the need for anticoagulation medication. Lisa also contends that Chad suffered from chest pain and fatigue as a result of his coagulation problems.

The ALJ referenced Chad's internal venal cava filter, anticoagulation medication, fatigue, and hospital visits in her RFC analysis. For instance, the ALJ noted that Chad received an internal venal cava filter and was taking blood thinner medication. [DE 7 at 26]. The ALJ also discussed Chad's fatigue acknowledging that he reported extreme daytime fatigue in October 2014 to the Mayo Clinic neurology unit. [DE 7 at 25]. However, the ALJ also indicated that the Clinic did not report any obvious signs of fatigue. [DE 7 at 26]. Furthermore, the ALJ acknowledged that Chad told SSA that he got tired easily and needed to take lots of breaks. [DE 7 at 28]. The ALJ also noted that the Mayo Clinic neurology unit and another treating neurologist recorded that Chad stopped working due to extreme fatigue. [DE 7 at 28]. Yet the ALJ found that Chad's claim of extreme fatigue was inconsistent with his behavior, drawing attention to the Mayo Clinic's note in 2014 that Claimant had been able to return to work with lighter job duties and walk a mile and a half "despite the claimant's fatigue, DTV, and other issues[.]" [DE 7 at 29].

Despite this discussion of Chad's fatigue, the ALJ does not appear to have connected Chad's fatigue to his coagulation problems. After all the Mayo Clinic report upon which the ALJ relies focused on Chad's neurological issues and only mentioned his fatigue tangentially, with a statement that he would benefit from an internal medical consult to address the fatigue. [*See* DE 7 at 697–700]. Moreover, the ALJ's emphasis on the Mayo neurologist's references to Chad's walking and exhaustion related to his fatigue seem inconsistent with the rest of the record. Therefore, the ALJ also may have

9

improperly "cherry-picked" fatigue-related comments from the Mayo Clinic report to support a finding of non-disability. *See Denton*, 596 F.3d at 425.

As to Chad's "several hospitalizations," Lisa does not specify which hospital visits are relevant here. [*See* DE 14 at 21]. Lisa only mentions two hospitalizations—Chad's July 2017 hospital visit, and the emergency room visit hours before his death—but without citation to any records from those visits. Notably, when analyzing if Chad's DVT met any listing, the ALJ observed that the record showed no evidence of complications from Chad's DVT that would have required the three or more hospitalizations within a twelve-month period necessary to meet Listing 7.08. [DE 7 at 24 (citing 20 C.F.R. Pt. 404, Subpt. P, Appx 1, § 7.08)]. Thus, Lisa's hospitalization argument is poorly developed at best leaving the Court unable to discern the import of these two hospitalizations.

With that said, the ALJ did not acknowledge Chad's chest pain or splenectomy. In support of her argument here on appeal, Lisa points to only one medical record—out of the roughly 500 pages of medical records, spanning eight years, in the entire administrative record before this Court—that mentions chest pain. [DE 14 at 9 n.46]. In particular, Lisa cites to notes from Chad's September 13, 2012, visit to Dr. James J. Heger, a Fort Wayne cardiologist, for evaluation of chest pain, fatigue, and dyspnea[3]. That office visit note simply reports Dr. Heger's "impression" that Chad suffered from "**EXERTIONAL CHEST PAIN AND FATIGUE**." [DE 7 at 664–65 (emphasis in

---

[3] "Dyspnea" is shortness of breath. *Shortness of Breath*, MAYO CLINIC https://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890 (last visited Aug. 23, 2021).

10

original)]. Yet Dr. Heger's office note does not draw a logical connection between Chad's reported chest pain in September 2012 and his history of coagulation problems. Similarly, Lisa only cites to one medical record from August 27, 2012, that merely reports Chad's splenectomy 20 years earlier but without making any connection between the splenectomy and his coagulation impairments. [*See* DE 7 at 666]. Without more, Lisa has not developed a sufficient argument as to Chad's chest pain and splenectomy to warrant remand.

However, Lisa's reference to Chad's autopsy report and his emergency room visit before his death, which seem to suggest an argument that the massive bilateral pulmonary thromboemboli that caused Chad's death is important to the Listing 7.18 analysis, is more persuasive. In the instant response brief, the Commissioner focuses on the testimony of the Agency's medical expert, Dr. Buckwalter, at the hearing. As the Commissioner notes, Dr. Buckwalter testified that Chad's impairments, especially his KTWS and DVT, appeared stable but always with potential of a blood clot. [DE 7 at 48]. Thus, Dr. Buckwalter was not surprised to learn that blood clots had caused Chad's death. [DE 7 at 48]. Yet, the ALJ did not mention Chad's cause of death or Dr. Buckwalter's specific testimony about blood clots in her decision. Thus, even though the ALJ frequently referenced Dr. Buckwalter's testimony and findings, she failed to acknowledge evidence discussing Chad's cause of death preventing the Court from determining whether such evidence was considered when assessing the severity of Chad's hematological disorders and resulting complications—both at the heart of the

11

any Listing 7.18 analysis. Such a gap in the logical bridge leaves the ALJ's decision unsupported by substantial evidence.

**C.     Limitations**

To meet the requirements of Listing 7.18, Chad must have also experienced marked limitation of activities of daily living, in maintaining social functioning, or in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, Appx 1 § 7.18. Lisa argues that Chad was sufficiently limited in activities in daily living to meet the requirement but does not address whether Chad was limited in maintaining social functioning or faced deficiencies in concentration, persistent, and pace preventing him from timely completing tasks. Lisa focuses on Chad's fatigue, walking endurance, confusion, and napping frequency in support of her argument that he suffered from marked limitation in activities of daily living. Lisa's arguments, however, do not support remand because the ALJ clearly considered and rejected Chad's fatigue, his need to take breaks, and the result of the fatigue leading him to stop working.

Regarding Chad's walking endurance, the ALJ cited Lisa's testimony that if Chad went to Walmart, he could not walk from the entrance to the back of the store and that six times a month Chad could not get out of his bed or recliner. [DE 7 at 26]. The ALJ also noted Mayo Clinic's observation that Chad could walk for a mile and a half despite his fatigue, DVT, and other issues. [DE 7 at 29]. Based on this evidence, the ALJ concluded that Chad "could stand and walk for 1 hour at a time, and for 3 hours total in an eight-hour work day." [DE 7 at 30].

Regarding Chad's alleged confusion, the ALJ discussed his May 2015 hospital visit where he complained of severe headaches and confusion while having a "seizure." [DE 7 at 27]. The ALJ also cited an October 2015 notation by Chad's treating neurologist, Dr. John D. Wulff, that what Chad referred to as seizures were more like migraines than seizures. [DE 7 at 27]. Thus, even though the ALJ noted Lisa's testimony that Chad had seizures regularly and napped frequently, and records from Jay Family Medicine in April 2016 of a seizure that led to another emergency room visit, the ALJ found the testimony inconsistent with the record and gave greater weight to Dr. Wulff's conclusion that Chad's "reported 'seizures' might actually have been part of a complex migraine." [DE 7 at 27].

Furthermore, the ALJ noted that Chad maintained his personal care, fixed simple meals, and performed light housework, including cleaning and laundry, as well as going outside once a day, going out alone, and going shopping. Thus, the ALJ supported her conclusion that Chad did not have marked limitation in activities of daily living with substantial evidence.

Lisa does not challenge the ALJ's conclusion that the record does not show marked limitation in Chad's social functioning skills. Nevertheless, the ALJ discussed Chad's social functioning when analyzing whether his neuropathy and weakness were impairments that met or medical equalled Listing 11.14.

Additionally, Lisa does not make any argument as to Chad's limitations of concentration, persistence, and pace. Yet the Commissioner contends that "the ALJ considered [Chad's] ability to concentrate, persist, and maintain pace, but noted that Chad had been able to return to work on lighter duty." [DE 16 at 6–7]. From this, the

Commissioner suggests that had the ALJ discussed Listing 7.18, she would have concluded—based on substantial evidence—that Chad did not meet the Listing. In other words, the Commissioner argues that the ALJ's failure to discuss Listing 7.18 was harmless error. This is a stretch.

First, the ALJ's failure to address the relationship between Chad's cause of death and his coagulation problems brings into question whether consideration of that evidence would lead to the same unfavorable decision the ALJ reached here. Second, the Commissioner's general assertion that the ALJ would necessarily find that Chad could not have a marked limitation in concentration, persistence, and pace is not as obvious a conclusion as the Commissioner implies. The ALJ briefly discussed Chad's ability to concentrate but did not clearly discuss persistence or pace even if the ALJ may have alluded to Chad's persistence and pace. Thus, the Court is left with "grave reservations" as to whether the ALJ's factual assessment in her decision adequately addressed the criteria of Listing 7.18 at issue here. See *Scott*, 297 F.3d at 595. Moreover, "the harmless error standard is not . . . an exercise in rationalizing the ALJ's decision and substituting our own hypothetical explanations for the ALJ's inadequate articulation." *McKinzey*, 641 F.3d at 892.

Therefore, the ALJ's failure to analyze Listing 7.18 is not harmless error as the Commissioner contends. The circumstances surrounding Chad's death arguably speak to the complications from his hematological disorders yet the ALJ made no mention of the cause of Plaintiff's death. Additionally, the ALJ's decision fails to address the adequately the question of whether Chad suffered from a marked limitation in

concentration, persistence, and pace. As such, the ALJ failed to discuss evidence in light of Listing 7.18's framework precluding the Court from finding that the ALJ's decision is free from legal error and is supported by substantial evidence. *See Scott*, 297 F.3d at 595.

## V. CONCLUSION

For the reasons stated above, the ALJ's failure to address Listing 7.18 was not a harmless error. Accordingly, the Commissioner's decision is **REMANDED** for further consideration consistent with this Opinion and Order.

**SO ORDERED** this 24th day of August 2021.

s/Michael G. Gotsch, Sr.<br>
Michael G. Gotsch, Sr.<br>
United States Magistrate Judge